## RICHMOND HOSIERY MILLS v. SOUTHERN SURETY COMPANY.

Eastern Section, April 12, 1930.

Petition for Certiorari denied by Supreme Court, July 5, 1930.

Sizer, Chambliss & Sizer, of Chattanooga, for appellant.
Joe V. Williams, of Chattanooga, for appellee.

THOMPSON, J. Complainant in this cause, Richmond Hosiery Mills, seeks to recover from the defendant $7,257.18, losses under a policy of credit insurance. The term of the policy sued upon was from January 1, 1928, to December 31, 1928, inclusive. The defendant cancelled the policy on February 29, 1928. The losses sought to be recovered by complainant were sustained by it between January 1, 1928, and February 29, 1928, inclusive, and complainant insists that notwithstanding the cancellation of said policy on February 29, 1928, it is entitled to recover said losses. On the final hearing the Chancellor dismissed the complainant's bill, and it has appealed to this Court and has assigned errors.

The complainant operates several hosiery mills, but its principal mill and place of business is at Rossville, Georgia, about five miles from Chattanooga. For several years prior to January 1, 1927, it had policies of credit insurance with other companies. But for the year 1927, i. e., from January 1, 1927 to December 31, 1927, inclu-

sive, it had a policy of credit insurance with the defendant company —said policy being No. 1839-Y. During the year 1927, complainant acting under the terms of said policy sent to the defendant numerous notifications of claims, etc. By December 31, 1927, the claims which complainant had made and which were pending for adjustment under said policy totaled $43,672.89, and they were to come up for adjustment between the complainant and the defendant in about 30 or 40 days thereafter when it was expected that the defendant would send one of its adjusters to complainant's place of business to make the adjustment.

Said adjuster, Mr. Eddy, went to complainant's place of business at Rossville on or about February 19, 1928, and spent three or four days in making the adjustment. After disallowing some of the claims and after deducting the "normal loss" and "agreed percentage of profits" as provided in the policy he made the adjustment on February 23, 1928, with the complainant for the sum of $21,109.81, and drew a draft on defendant in favor of complainant for said sum. Complainant cashed the draft and signed a receipt and release of all claims under said policy No. 1839-Y.

On December 31, 1927, complainant made the application for the policy now sued upon, i. e., Policy No. 2237-Y, the term of which was from January 1, 1928 to December 31, 1928, inclusive. At that time complainant, as above shown, had over $40,000 of claims filed with the defendant and it did not know what sort of an adjustment it would get out of defendant. So, at the time it made the application it required that the defendant attach what is called a "satisfactory adjustment rider" to the policy. The complainant on said date, December 31, 1927, paid the premium of $2500 and said policy No. 2237-Y was issued with the "satisfactory adjustment rider" attached. Between January 1, 1928, and February 29, 1928, complainant filed with defendant under said policy claims aggregating $13,-896.03. We might state here that thereafter $2,519.36 was paid by the debtors on these claims, and $29.71 of goods sold to one of the debtors was returned to complainant—thus reducing the total to $11,396.87,—and that complainant then deducted the "normal loss" and "percentage of profits" (computed by complainant on a basis which it insists was fair and equitable) and now insists that defendant is liable to it for the balance, i. e., $7,257.18.

We will now quote the "satisfactory adjustment rider" which was attached to the policy sued upon. It was as follows:

"Satisfactory Adjustment Rider

"By this rider attached to and made part of Policy No. 2237-Y issued by the Southern Surety Company to Richmond Hosiery Mills of Rossville, Georgia, it is agreed that if the adjustment of policy No. 1839-Y, heretofore issued to the insured by the Southern Surety Company, is not satisfactory to the insured, the right is hereby given

the insured to cancel Policy No. 2237-Y upon notice in writing to the Company within ten days after the draft has been paid, such written notice to be in the form of a registered letter, upon receipt of which the Company will tender draft for amount of premium paid, and the insured hereby agrees that such draft will be accepted by them as legal tender.

"The Southern Surety Company also reserves the right to cancel Policy No. 2237-Y in the event anything develops in the adjustment that in any way jeopardizes the Company's interest. This cancellation is to be in the form of a registered letter mailed to the insured within ten days from the date the draft has been paid, to which will be attached a draft for amount of premium paid, and the insured hereby agrees that such draft will be accepted by them as legal tender.

"Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements or limitations of this Policy, other than as above stated.

"All other terms and provisions of this Policy to remain in full force and effect."

When the defendant's adjuster, Mr. Eddy, finished making the adjustment of the 1927 policy on February 23, 1928, and wrote his company a letter telling them that he had drawn a draft on them in favor of the complainant for the $21,109.81, etc., he also advised them to cancel the policy because he felt that the information which he had gained while making the adjustment about the way complainant was conducting its business, etc., showed that to stay on the risk would be extremely hazardous and not in proportion to the premium. So, on February 29, 1928, which was of course within the ten days allowed by the satisfactory adjustment rider, the defendant wrote complainant a letter as follows:

"We enclose herewith our check #101297, to your order, for $2,500 being refund in full of premium on the credit insurance policy #2237-Y, as provided in paragraph #2 of satisfactory adjustment rider attached to said policy.

"Notice is hereby given of the cancellation of this policy and you are advised to return the same to this office at your earliest convenience and oblige."

On March 6, 1928, complainant replied as follows:

"Your letter of February 29, enclosing check for $2,500 and giving notice of cancellation of our credit insurance policy, is acknowledged.

"We notice that you state premium is refunded as provided in satisfactory adjustment rider attached to the policy.

"Our interpretation of the provisions of this rider does not convince us that you are justified in demanding cancellation of the policy. We are not aware that the adjustment of our policy has been other than satisfactory, nor is it clear to us how or to what

extent the interests of the Southern Surety Co., have been jeopardized by any thing which has developed in the adjustment.

"It can hardly be suggested that any facts became known during the process of adjustment which were not apparent at the time our new policy was solicited and issued.

"We return herewith your check for $2,500 and certainly expect that it shall be accepted as originally tendered."

On March 8, 1928, defendant wrote complainant as follows:

"We have your letter of the 6th inst. replying to our letter of February 29th in which we enclosed check to you in the sum of $2500, same being check No. 101297, in refund in full for premium paid under credit insurance policy No. 2237-Y, issued to your company effective January 1, 1928, said check covering return premiums as paid in accordance with paragraph 2 of Satisfactory Adjustment Rider.

"We note that you return this check to this company stating that you disagree with the interpretation placed upon the provisions of the Satisfactory Adjustment Rider by us and advising that you are not aware that the adjustment of the policy had been other than satisfactory and that you do not understand to what extent the interests of the Southern Surety Company have been jeopardized by anything which developed in the adjustment.

"The Rider, of course is self-explanatory and its intention we believe to be sufficiently clear and it is to the effect that if the adjustment of the policy issued by this Company is not satisfactory to you, the insured, the right is given you to cancel the policy upon notice in writing to the Company within ten days after the adjustment, providing that notice shall be given to this Company by you in that event, and further agreeing that upon the receipt of such notice this Company will tender draft for the amount of premium paid.

"There is, likewise, in this so-called Satisfactory Adjustment Rider, a provision to the effect that the Southern Surety Company also reserves the right to cancel the policy in the event anything developes in the adjustment that in any way jeopardizes the Company's interests and provides how this notice shall be given in case this Company elects to cancel and provides that draft shall be attached to such letter for the amount of premium paid.

"The Southern Surety Company elected to take advantage of the provision of the so-called Satisfactory Adjustment Rider and therefore wrote you under date of February 29, 1928, enclosing check for $2500 which letter yours of March 6th replies to and in which letter you return the said check No. 101297 to this Company.

"You, of course, appreciate why this Adjustment Rider is a part of the agreement between your Company and ours. You know

that these policies are written for the period of one year. You are further conscious of the fact that an adjustment cannot be made and ready at the expiration of the year in which the policy runs and that said Adjustment Rider is made a part of the contract between the insurer and the insured for the very purpose of taking care of the situation to the end that it shall appear that when the audit is made that the insurance is unprofitable to this Company or extra hazardous, or in other words jeopardizes this Company's interests, this Company has the privilege to elect to exercise the right given in the Rider. The audit showed that this Company had sustained a large loss by virtue of its former policy and had paid your Company a good many thousand dollars.

"I wish to advise you that we stand firmly upon our letter of February 29th in which we gave you notice of cancellation of your credit insurance policy running from this Company to you and wish further to advise you that this Company considers said policy cancelled; that this Company has acted within its rights as provided in the contract between this Company and yourself; and that this Company will not be responsible to you under any of the provisions of said policy and will treat said policy as cancelled and of no force and effect.

"Hence, we are returning herewith to you our check No. 101297, as refund in full for premium paid under said credit insurance policy No. 2237-Y issued your Company, effective January 1, 1928. You will therefore be governed accordingly."

On March 26, 1928, complainant wrote defendant as follows:

"Reply to yours of March 8th.

"We have not understood that the cancellation rider reserved to you the right to cancel merely because you find the business unprofitable. Losses are always within the contemplation of the parties when insurance is issued—otherwise none would be issued. If the intention had been to reserve to you this broad right, your right would have been reserved in language as broad as that reserving to the insured the right of cancellation; that is, if the adjustment "is not satisfactory to the insured." Your right is quite differently expressed, reading only "in the event anything develops in the adjustment"—not anything that proves unsatisfactory to you, but that "jeopardizes the Company's interests." Now we have been unable to see how anything developed in the adjustment that jeopardized your interests.

"However, we understand that you are firm in your demand to cancel and it is no doubt useless to argue with you about that.

"But, reserving the question as to the entire year, we assume that you must recognize liability for such proportionate losses as have already accrued, that is, from January 1st to February 29th

when you exercised your option to cancel which you claim. Certainly your protection extends over these two months and with this in mind, we enclose our check for $416.67, being one-sixth of the total year's premium, contemplating adjustment between us hereafter of our losses for those two months."

On March 30, 1928, defendant wrote complainant as follows:

"We have for acknowledgment yours of the 26th. We cannot agree with your understanding of the cancellation rider attached to the renewal policy. Certainly losses are anticipated but exorbitant losses such as paid under your policy are not contemplated, and it is against such catastrophes that the cancellation privileges are reserved by satisfactory adjustment riders for the Company.

"Your suggestion in your opinion nothing developed in the adjustment to jeopardize the company's interest is entirely untenable. Certainly the payment of $20,000 loss is ample proof of an unsatisfactory contract and in itself is sufficient to jeopardize our interests very materially in the renewal contract; so much so that a continuation of the liability on our part would be vary hazardous and unbusiness like.

"We deny liability for the proportionate period you claim this policy remained in effect before we exercised the cancellation privilege. Our understanding is that credit insurance policies are written for periods of twelve months. In our judgment it would be very difficult to determine the losses occurring within the sixty days, and to assume liability for that time would no doubt involve us in a very serious and embarrassing situation.

"We are, therefore, returning herewith your check payable to our order #7459 in the sum of $416.67, intended to cover the premium for the proportionate part of the year, and we regret very much that we cannot accept coverage for that period, contemplating the adjudgment of losses which you may sustain for the two months."

Later the complainant made formal demand for the payment of losses which occurred between January 1, 1928, and February 29, 1928, and defendant declined to pay.

It will be seen from the foregoing that complainant accepted the return of the year's premium, i. e., $2500 and in effect agreed that defendant might cancel or terminate the policy as of February 29, 1928, but offered to prorate the premium and pay it at the yearly rate for the two months that it wanted to treat the policy as being in effect, but that defendant refused to accept the prorated premium for the two months and refused to agree that said policy was in effect during said two months. Thereafter complainant never revoked its agreement that the policy might be cancelled or terminated as of February 29, 1928, and never offered to return the full yearly premium of $2500 although it tendered the $416.67 with its bill in

this cause. So, the question is not whether the defendant had the right under the terms of the rider to cancel the policy, but is whether it had the right under the terms of said rider to cancel the policy ab initio so as to avoid paying losses occurring between January 1, 1928, and February 29, 1928, or only the right to cancel as and from February 29, 1928, so as not to be able to avoid paying losses occurring between said dates.

The term of the policy as fixed in the insuring clause was from January 1, 1928 to December 31, 1928, both inclusive. There is no provision in the policy itself with reference to a cancellation thereof or with reference to prorating the premium, or short term premium or premium at short term rate, etc. The policy required the payment of the entire yearly premium in advance, which was complied with, and also provided: "This policy does not cover any loss occurring prior to the payment of the premium therefor, although the policy may have been delivered," etc.

There is only one condition or provision in the policy with reference to a termination of the policy prior to the expiration of the yearly term. It is as follows:

"8—Termination—If, during the term of this policy, the insured shall become insolvent, as defined in any one or more of the Subdivisions of Condition 2 of this Policy except Subdivisions (6), (12), (14), or (15), or shall cease to continue the business described in the said application for this Policy as heretofore carried on, or shall go into liquidation, or being a partnership shall be dissolved, then this Policy shall immediately terminate, and if any claim for excess loss is made a Final Statement of claim shall be filed by the insured in the same manner as provided for in Condition 6 of this Policy and be received by the Company within thirty (30) days after such termination, and an adjustment shall be made with the insured within forty (40) days after the receipt by the Company of such Final Statement in the same manner as if this Policy had originally by its terms been made to expire at the date of such termination. Temporary interruption by fire or by strike, or the death or withdrawal or admission of a member of a partnership composed of more than two members, shall not be considered a discontinuance or dissolution."

The terms and provisions of the policy and riders attached thereto make it plain that the defendant was not to pay separately each separate loss sustained by the complainant. It is equally clear that no payments were to be made by defendant during the term of the policy. As soon as practicable after the expiration of the term of the policy, the defendant was to make an adjustment of the complainant's losses sustained during said entire term, but defendant was not to pay all of complainant's said losses. In the adjustment

the amount of complainant's net covered and proven losses for the year was to be first calculated and fixed. Then from that sum there was to be deducted a "normal loss" for the year computed in a manner provided, and to be not less than $20,000. Then from this remainder there was to be deducted ten per cent thereof. The remainder of this deduction was the amount to be paid by defendant to complainant in settlement and satisfaction of the liability under the policy.

Complainant calculated the liability of the defendant for· the losses sustained by it between January 1, 1928, and February 29, 1928, in the following manner: The aggregate or total of its net losses sustained during this period was $11,396.87. It treated the "normal loss" for said period of two months as being one-sixth of the $20,000 minimum "normal loss" for the year provided for in the policy, i. e., as the sum of $3,333.33. So, from the $11,396.87, it deducted the $3,333.33. The remainder was $8,063.54. It then deducted 10 per cent of this sum, i. e. $806.35, from said sum, and the remainder was $7,257.19—the amount it claims it is entitled to recover.

The question, it seems to us, depends upon the proper construction to be given the word "cancel" in the satisfactory adjustment rider in the light of the context in which it was used, and of the situation of the parties and of the provisions of the policy.

On December 31, 1927, when the application was made and the policy was issued with the rider attached, the situation was that the complainant had a large claim on file with the defendant under the 1927 policy, and did not know whether the defendant was going to make an adjustment of said claim which would be satisfactory. Complainant therefore required of the defendant that it attach to the 1928 policy the satisfactory adjustment rider giving to complainant the right to cancel said policy within ten days after the payment of the draft to be given in payment of the adjustment of said 1927 policy if said adjustment was not satisfactory to complainant, and the right to receive back all of the premiums for the 1928 policy, i. e. $2500 which it paid on said December 31, 1927. Clearly this gave the complainant the right to cancel the policy ab initio. This was under the first paragraph of the rider.

The second paragraph is as follows:

"The Southern Surety Company also reserve the right to cancel Policy No. 2237-Y in the event anything develops in the adjustment that in any way jeopardizes the Company's interests. This cancellation is to be in the form of a registered letter to be mailed to the insured within ten days from the date the draft has been paid to which will be attached a draft for amount of premium paid, and the insured hereby agrees that such draft will be accepted by them as legal tender."

The use of the words: "The Southern Surety Company also reserve the right to cancel," etc., indicates that the draftsman meant to use the word "cancel" in the same sense in which he had used it in the first or preceding paragraph, i. e., as cancel ab initio. And the "Premium paid," which the defendant agreed to return to complainant, was the full yearly premium ($2500) which complainant paid on December 31, 1927, when it signed the application and when the policy was issued.

The time within which the rider-gave each of the parties the right to cancel was the same, i. e., within ten days after the payment of the draft to be given by the defendant to the complainant in payment of the adjustment of the 1927 policy. Now, if complainant had exercised its right to cancel, in which event it would have gotten back the entire yearly premium for the year, 1928, it certainly could not have then tendered back to the defendant one-sixth of said premium and held defendant liable for its losses sustained during January and February, 1928. Upon what ground then can we presume that the parties meant that if defendant exercised its right to cancel and pay back the entire yearly premium, the complainant could then tender back one-sixth of said yearly premium, and hold defendant liable for its losses sustained during January and February, 1928.

There is no provision in the policy for short term premium rates, and the entire policy, including the provisions governing the method of determining how much the defendant is to pay in adjustment of its liability thereunder, contemplates nothing less than a full year's term.

For us to permit complainant to pay one-sixth of the yearly premium and to then hold defendant for its losses sustained during the two months, January and February, 1928, would be our making of a contract between the parties which they did not make themselves. And we could not even feel assured that we were making a fair contract between the parties because January and February may be the two months in the year in which complainant is liable to sustain the heaviest losses and one-sixth of the yearly premium might not be commensurate with the risk which the defendant would incur in insuring the complainant during said two months, and because one-sixth of $20,000 (the minimum normal loss for the year) might not be one-sixth of the full normal loss for the entire year which alone is contemplated by the terms of the policy. In other words, we would have to make a contract between the parties determining both the amount of premium which the complainant would have to pay and the method of calculating the adjustment which the defendant would have to pay; and we would not even know that we had made

a fair and equitable contract. Of course we have no right or power to do any such thing.

The Chancellor in his memo dealt with some other questions which we do not think it necessary to deal with in this opinion because we think the foregoing is determinative of the case against the complainant, but we concur fully in all of the facts found by the Chancellor and in his conclusions thereon.

It results that in our opinion there was no error in the decree of the Chancellor and the same will be affirmed with costs.

Portrum and Snodgrass, JJ., concur.